MIDDLESEX MUTUAL   )
ASSURANCE COMPANY  )
           )
   Plaintiff/     )
   Counterclaim Defendant, )
           )
  v.        )   CV-09-375-B-W
           )
DOROTHY M. FISH   )
           )
   Defendant/    )
   Counterclaim Plaintiff )

## ORDER AFFIRMING THE RECOMMENDED DECISION

   This case is an example of the occasionally counterintuitive world of insurance contract law. To secure insurance coverage, the injured party, Dorothy M. Fish, argues that the tortfeasor was not an insured and therefore Middlesex Mutual Assurance Company (Middlesex) must cover her injuries, and to avoid indemnifying Ms. Fish, Middlesex argues that the tortfeasor was an insured and therefore it provided no coverage. The Court concludes that the tortfeasor was not an insured but that coverage is still precluded under the auto exclusion provision of Middlesex's comprehensive general liability (CGL) policy because the tortfeasor had loaned his motor vehicle to his business. Finally, the Court concludes that the parking exception to the auto exclusion does not apply for the same reason.

   The Magistrate Judge found that the automobile exclusion precludes coverage and recommended that the Court grant summary judgment in favor of the insurance company. The Court has reviewed and considered the Magistrate Judge's

Recommended Decision, together with the entire record, and has made a *de novo* determination of all matters adjudicated by the Magistrate Judge's Recommended Decision. Adopting some, but not all of the Magistrate Judge's reasoning, the Court affirms the Magistrate Judge's Recommended Decisions for the reasons in her recommendation and for the additional reasons in this Order.

## I. STATEMENT OF FACTS

On January 19, 2006, Ms. Fish was injured when she hit Robert E. Clark, Jr.'s truck that was blocking part of Main Street in Readfield, Maine. At the time of the accident, Mr. Clark, who is president of Clark's Custom Cabinetry, a closely owned family corporation, had just returned from installing cabinets for Clark's Custom Cabinetry and was unloading tools and materials from his personal truck to take to the shop.[1] The truck Mr. Clark owned and was operating at the time of the accident was a 2000 GMC extended cab truck, and he was hauling a Hallmark closed trailer, which he personally owned as well.

Mr. Clark's personal auto insurance policy with Allstate Insurance Company (Allstate) provided up to $100,000 in coverage for each occurrence, and Clark's Custom Cabinetry held a CGL policy with Middlesex Mutual Assurance Company

---

[1] Middlesex says that the truck

> was used predominately for [the business of Clark's Custom Cabinetry]. The pickup truck was garaged at the business location (the shop) of Clark's Custom Cabinetry. At least one employee of Clark's Custom Cabinetry had keys to the pickup truck, and Mr. Clark himself used the pickup truck for the business.

*Middlesex's Resp. to Fish's Obj. to Rec. Dec.* at 12 (Docket # 36) (*Middlesex's Resp. to Fish's Obj.*). Middlesex has not cited to the record or included the facts in its Statement of Material Facts. *Middlesex's Statement of Material Facts* (Docket # 18). At oral argument, Ms. Fish contended that facts about Clark's Custom Cabinetry's general use of Mr. Clark's truck are not part of the summary judgment record. The Court has found no record evidence of Middlesex's assertions and ignores them for summary judgment purposes.

(Middlesex) that provided up to $1,000,000 for an occurrence. Clark's Custom Cabinetry did not hold commercial auto insurance at the time of the accident, having let its commercial auto policy for a company vehicle expire. *Id.*

In March 2007, Ms. Fish sued Mr. Clark in Maine Superior Court and in November 2007 she amended her complaint to add Clark's Custom Cabinetry as a defendant. Although notified of the initial and amended lawsuit, Middlesex refused to defend or indemnify, maintaining that the policy excluded coverage. In June, 2008, in return for an Assignment of Rights and Covenant not to execute against either of them, Mr. Clark and Clark's Custom Cabinetry stipulated to entry of judgment in favor of Ms. Fish in an amount to be determined by the court. On May 29, 2009, the Maine Superior Court awarded Ms. Fish $1,448,691.21 plus interest and costs. Middlesex received notice of the damages hearing but did not participate.

On August 17, 2009, Middlesex sued Ms. Fish in federal court for a declaratory judgment that under the terms of the Middlesex policy it was not obligated to pay the judgment awarded Ms. Fish. *Compl.* at 3 (Docket # 1). On September 11, 2009, Ms. Fish answered and counterclaimed, seeking the full amount of the state court judgment pursuant to Maine's "reach and apply" statute, 24-A M.R.S.A. § 2904. *Answer to Am. Compl. and Counterclaim* at 7 (Docket # 7).

On October 15, 2009, Ms. Fish moved for summary judgment. *Fish's Mot. for Summ. J.* (Docket # 13). She argued that Middlesex's policy provided coverage because Mr. Clark is not an insured under the plain language of the policy and the

automobile was not operated by or loaned to an insured. On November 5, 2009, Middlesex responded and also moved for summary judgment. *Middlesex's Resp. in Opp'n to Fish's Mot. for Summ. J.* (Docket # 15) (*Middlesex's Resp.*); *Middlesex's Mot. for Summ. J.* (Docket # 17) (*Middlesex's Mot.*). Middlesex argued that its policy excluded coverage because Mr. Clarke is an insured and the vehicle was loaned to and operated by Clarke's Custom Cabinetry, a named insured.

On November 25, 2009, Ms. Fish responded to Middlesex's motion for summary judgment and in the same motion, replied to Middlesex's response to her motion for summary judgment. *Fish's Resp. in Opp'n to Middlesex's Mot. for Summ. J. and Reply to Middlesex's Resp. in Opp'n to Fish's Mot. for Summ. J.* (Docket # 24) (*Fish's Resp.*). On December 9, 2009, Middlesex replied to Ms. Fish's response. *Middlesex's Reply to Fish's Resp. in Opp'n to Middlesex's Mot. for Summ. J.* (Docket # 32). On February 16, 2010, the Magistrate Judge recommended that the Court grant Middlesex's motion for summary judgment. *Report and Recommended Decision* (Docket # 33) (*Rec. Dec.*). On February 23, 2010, Middlesex objected to the Recommended Decision. *Middlesex's Obj. to Rec. Dec.* (Docket # 34) (*Middlesex's Obj.*). On March 2, 2010, Ms. Fish objected to the Recommended Decision and requested oral argument. *Fish's Obj. to Rec. Dec.* (Docket # 35) (*Fish's Obj.*). On March 16, 2010, Middlesex responded to Ms. Fish's objections. *Middlesex's Resp. to Fish's Obj.* The Court held oral argument on June 29, 2010.

### A.  The Middlesex Policy

The Middlesex policy provides Clark's Custom Cabinetry with $1,000,000 in coverage for "those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies." *Middlesex policy, part 2b* Attach. 3 at 4 (Docket # 23). The CGL policy gives a detailed definition of who is an insured:

> 1.    If you are designated in the Declarations as:
> . . .
> d. An organization other than a partnership, joint venture or limited liability company, you are an insured. Your "executive officers" and directors are insureds, but only with respect to their duties as your officers or directors . . .
> . . .
> 2.    Each of the following is also an insured:
>
> a. Your . . . "employees", other than . . . your "executive officers" . . . but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business. . . .

*Id*. at 12. An Automobile Exclusion limits the policy's applicability to automobile accidents. It excludes from coverage

> "[b]odily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft owned or operated by or rented or loaned to any insured. Use includes operation and "loading or unloading."

*Id*. at 7. The policy also includes a Parking Exception to the exclusion. The exception specifies that the Automobile Exclusion does not apply to "[p]arking an 'auto' on, or on the ways next to, premises you own or rent, provided the 'auto' is not owned by or rented or loaned to you or the insured." *Id*.

## B.    The Recommended Decision

The Magistrate Judge focused her Recommended Decision around two central questions: whether Mr. Clark was "an insured" when performing non-executive

functions and whether the automobile exclusion applies. The Magistrate Judge concluded that the answer to the first question was factual. *Rec. Dec.* at 9. She found that a "reasonable person of ordinary intelligence in Mr. Clark's position" would find the language covering Mr. Clark's non-executive functions ambiguous: on one hand, excluding him from coverage would "frustrate the primary purpose for which someone in Mr. Clark's position would secure CGL coverage," but on the other hand, the literal language of the policy limits coverage of Mr. Clark to when he is performing executive functions. *Id.* at 8-9. Having found an ambiguity, the Magistrate Judge found it could only be resolved in relation to "the basic understanding of the contracting parties." *Id.* at 9. Because such information was not in the record, the Magistrate Judge recommended that the "Court should deny summary judgment to either party on the issue of whether Mr. Clark was an insured." *Id.* at 9-10.

In answer to the second question, the Magistrate Judge recommended that the Court grant summary judgment in favor of Middlesex. Even assuming Mr. Clark is not an insured, the Magistrate Judge found that the automobile exclusion applies as a matter of law. *Id.* at 10. Working backwards, she determined that the parking exception does not override the automobile exclusion because at the time of the accident Mr. Clark's vehicle was transporting Clark's Custom Cabinetry's tools and employees. Because the truck "was being put in service to Clark's Custom Cabinetry and was being operated by an agent of the corporation," the Magistrate Judge concluded that it was loaned to Clark's Custom Cabinetry. *Id.* at 11. These

same facts caused the Magistrate Judge to find that the automobile exclusion did apply: the vehicle was used by an insured, Clark's Custom Cabinetry, when it was put in service to the corporation and it was operated by Clark's Custom Cabinetry when Mr. Clark, as an agent for the corporation, drove it. *Id.* Because the automobile exclusion applies and the parking exception does not, the Magistrate Judge concluded that "insurance proceeds are not available as a matter of law." *Id.*

### C. The Position of the Parties

#### 1. Ms. Fish

Ms. Fish objects to both of the Magistrate Judge's conclusions. First, Ms. Fish contends that the Magistrate Judge erred in finding ambiguity about whether Mr. Clark was an insured when he performed non-executive functions. *Fish's Obj.* at 6. Ms. Fish presses her view that the language of the policy explicitly excludes Mr. Clark from coverage when he performs executive functions: because the policy stipulates that "'executive officers' and directors are insureds, but ***only*** with respect to their duties as your officers or directors," "[t]he inescapable result is that Mr. Clark is an insured under the policy only while he is performing his 'duties as [the corporation's] officer or director.'" *Id.* at 7 (quoting *Middlesex policy, part 2b* Attach. 3) (emphasis added by Ms. Fish). Because the language is unambiguous, Ms. Fish concludes the Magistrate Judge erred. *Id.* at 7-8 (citing *Creel v. La. Pest Control Ins., Inc.*, 723 So. 2d 440, 443 (La. Ct. App. 1998) (interpreting similar policy language to unambiguously preclude an executive officer from "being an employee and, thus, an insured except when performing his executive duties")). In the

alternative, Ms. Fish contends that having erroneously found an ambiguity, the Magistrate Judge "compounded that error by failing to apply Maine law to resolve [it]." *Id*. at 9. Ms. Fish argues that Maine law resolves ambiguity in insurance contracts "in favor of the insured." *Id*. (quoting *Jipson v. Liberty Mut. Fire Ins. Co.*, 2008 ME 57, ¶ 10, 942 A.2d 1213, 1217).

Second, Ms. Fish makes multiple arguments for why the Magistrate Judge erred by finding the auto exclusion applicable. Agreeing with the Magistrate Judge that Clark's Custom Cabinetry did not own or rent Mr. Clark's vehicle, Ms. Fish contends it also did not loan or operate the truck. *Id*. at 12. Ms. Fish argues that the Magistrate Judge applied the wrong test for whether the vehicle was loaned: "Where nothing more than an employee's use of his own vehicle in furtherance of the employer's business has been shown, a loan of the vehicle to the employer has not been established." *Id*. (citing *Generali U.S. Branch v. The Boyd School, Inc.*, 887 So. 2d 212, 216-17 (Ala. 2004)). Instead, Ms. Fish asserts that a loan can be established only through an agreement to hire the vehicle or a surrendering of possession control to the insured. *Id*. at 13. Similarly, Ms. Fish argues that the Magistrate Judge erred when she equated "use" of the vehicle with "operation." *Id*. at 14. Citing Maine law that distinguishes between use and operation, Ms. Fish contends that although "use" is broader, operation "can only refer[] to the actions of the individual driving the vehicle." *Id*. (citing *Allstate Ins. Co. v. Lyons*, 400 A.2d 349, 352 (Me. 1979)). According to Ms. Fish, a corporation can "use" a vehicle if it is employed for the corporation's benefit, but as a non-person, a corporation can never

"operate" a vehicle. *Id.* Ms. Fish also makes a second, broader argument for why operation by Mr. Clark does not constitute operation by Clark's Custom Cabinetry for purposes of insurance coverage: "*respondeat superior*, while a necessary feature of liability law, does not create an identity between the employee and the corporation for all purposes." *Id.* at 15. Ms. Fish argues that applying the doctrine of *respondeat superior* to questions of insurance coverage "improperly subverts [the policy's] structure and terms and expands the exclusion beyond those terms, contrary to the requirements of Maine law." *Id.* At the very least, Ms. Fish contends it is ambiguous whether the automobile exclusion applies, mandating that the exclusion be read "in favor of coverage." *Id.* (citing *Union Am. Ins. Co. v. Maynard*, 752 So. 2d 1266, 1268-69 (Fla. Dist. Ct. App. 2000)).

Finally, Ms. Fish asserts that the automobile exclusion does not apply because the parking exception does. In addition to the fact the automobile was not "owned by or rented or loaned to" Clark's Custom Cabinetry, Ms. Fish contends that Mr. Clark was "clearly 'parking' his truck 'on the ways next to the premises' on which the insured corporation maintained a separate building dedicated to its business." *Id.* at 16-17. Although admitting at oral argument that Clark's Custom Cabinetry did not own or formally rent the building, Ms. Fish maintains that the Court should imply a rental agreement as a matter of law because the law assumes that a business will make such arrangements.

## 2. Middlesex

Middlesex also objects to the Magistrate Judge's recommended decision, arguing that the policy unambiguously shows that Mr. Clark is an insured. Although acknowledging that a literal reading of the policy suggests that executives are not covered when performing non-executive functions, Middlesex contends that such a literal interpretation is "mechanical and illogical." *Middlesex's Obj.* at 6 (criticizing the *Creel* decision that endorsed such a reading). Middlesex's argument revolves around the absurdity of the result: no reasonable person in Mr. Clark's position would think that the insurance he purchased for his business would not also provide him with protection when performing his ordinary daily work. *Id.* Instead, Middlesex proposes that a more logical interpretation of the policy language would apply the portion of the "Who is an Insured" definition that corresponds "to the duties he was performing at the time of the injury-producing injury." *Id.* at 7. In the alternative, Middlesex, like Ms. Fish, argues that having erroneously found an ambiguity, the Magistrate Judge further erred by turning to "evidence of the 'intent' of the parties to the contract" for resolution. *Id.* at 10-11. Although further agreeing with Ms. Fish that the Court should resolve any seeming ambiguity by construing the policy "in favor of the insured," Middlesex contends that this principle requires the Court to find that Mr. Clark is an insured, although coverage would be denied in the instant case. *Id.* at 10.

Middlesex agrees with the Magistrate Judge's conclusion that the automobile exclusion applies because Clark's Custom Cabinetry both loaned and operated Mr. Clark's truck. Middlesex contends that a "loan" is "a grant of the temporary use of

something." *Middlesex's Resp. to Fish's Obj.* at 10 (quoting *Fireman's Fund Ins. Co. v. Dollar Sys., Inc.*, 699 So. 2d 1028, 1030 (Fla. Dist. Ct. App. 1997)). Similar to other cases that found employees had loaned vehicles to employers, Middlesex argues that Clark's Custom Cabinetry's use of the truck—the vehicle was used predominantly by the business, it was garaged at the business, and at least one employee had keys to it—establishes that Mr. Clark had loaned his vehicle to the company. *Id.* at 11-12 (citing, for example, similar facts in *Bosch v. First Fin. Ins. Co.*, No. C 04 3837 (SBA), 2006 WL 1600581, at *6 (N.D. Cal. June 7, 2006)). Middlesex finds Ms. Fish's contrary cases either unpersuasive or factually distinguishable. *Id.* at 8-9. Middlesex also asserts that ample authority supports the Magistrate Judge's conclusion that "Mr. Clark's operation of the pickup truck is equivalent to operation by Clark's Custom Cabinetry" for purposes of insurance contract provisions. *Id.* at 12. Although acknowledging the distinction between "use" and "operation" highlighted by Ms. Fish, Middlesex finds it irrelevant: because operation of a vehicle constitutes use, the distinction between the two terms is meaningless. *Id.* at 13 (citing *Lyons*, 400 A.2d at 261). At oral argument, Middlesex clarified that although maintaining that Clark's Custom Cabinetry both loaned and operated Mr. Clark's truck, Middlesex considered "operated by" the stronger of the two arguments.

Finally, Middlesex finds no barrier to the automobile exclusion in the parking exception. Inverting its language, Middlesex describes the conditions under which the parking exception does not apply: 1) Clark's Custom Cabinetry did not own or

rent its shop building; 2) Mr. Clark was an insured; or 3) the truck was loaned to Clark's Custom Cabinetry. *Id.* at 14. Having addressed the second and third prongs, Middlesex focuses on how Ms. Fish fails the first element. *Id.* Middlesex argues that Clark's Custom Cabinetry neither owned nor rented its shop premises. *Id.* Because there is no record evidence of a formal rental agreement, Middlesex contends that as a matter of law, Ms. Fish has not met her burden to prove the applicability of the parking exception. *Id.*

## II. DISCUSSION

### A. An Analytical Synopsis

The Court's analytic path depends on whether Mr. Clark is an insured under the terms of the policy. Because each policy provision references "insured," the meaning of the provisions changes depending upon whether the reference is to Mr. Clark, to Clark's Custom Cabinetry, or to both.

#### 1. If Mr. Clark is "an insured"

To start, if Mr. Clark fits within the definition of "an insured," the automobile exclusion applies to him because Ms. Fish sustained "'bodily injury' . . . arising out of the . . . use . . . of any . . . 'auto' . . . owned or operated by . . . any insured." *Middlesex policy, part 2b* Attach. 3 at 7. Thus, if Mr. Clark is "an insured," coverage is excluded unless the parking exception applies.

The parking exception to the automobile exclusion applies if the insured is "[p]arking an 'auto' on, or on the ways next to, premises you own or rent, provided the 'auto' is not owned by or rented or loaned to you or the insured." *Id.* This

exception requires: (1) that Mr. Clark was "parking" an automobile when the accident occurred; (2) that Mr. Clark was not the owner, renter, or borrower of the vehicle; and (3) that Clark's Custom Cabinetry owns or rents the property onto which Mr. Clark was parking the vehicle.

### 2. If Mr. Clark is not "an insured"

If Mr. Clark is not "an insured," then as "an insured" he did not own or use the auto and coverage would not be excluded under that provision. However, coverage might be excluded under the phrase that precludes coverage if the auto was being "operated by or . . . loaned to any insured" at the time of the accident. *Middlesex policy, part 2b* Attach. 3 at 7.[2] "[A]ny insured" would include Clark's Custom Cabinetry and the question becomes whether Mr. Clark was loaning his personal vehicle to Clark's Custom Cabinetry or whether Clark's Custom Cabinetry was operating Mr. Clark's vehicle. If he did loan his vehicle to his business or if the business was operating it, coverage would be excluded; if he did not, coverage would not be excluded under this provision.

If coverage is excluded under the auto exclusion, the question turns to whether coverage is provided under the parking exception. If Mr. Clark is not "an insured," the parking exception requires (1) that Mr. Clark was "parking" an automobile when the accident occurred; (2) that Clark's Custom Cabinetry was not the owner, renter, or borrower of the vehicle; and (3) that Clark's Custom Cabinetry owns or rents the property onto which Mr. Clark was parking the vehicle.

---

[2] The automobile exclusion would also preclude coverage if Mr. Clark's truck was "owned or operated by or rented" to Clark's Custom Cabinetry. *Middlesex policy, part 2b* Attach. 3 at 7. Here, however, Clark's Custom Cabinetry did not own or formally rent Mr. Clark's truck.

**B.      Burdens of Proof**

The insured bears the initial burden of showing that injury falls within the scope of the contract.  *See, e.g.*, *Pelkey v. Gen. Elec. Capital Assur. Co.*, 2002 ME 142, ¶ 10, 804 A.2d 385, 386; *Barrett Paving Materials, Inc. v. Cont'l Ins. Co.*, 488 F.3d 59, 67 (1st Cir. 2007) (citing *Pelkey* for conclusion that Maine law places the burden on insured to establish coverage).   Once coverage is shown, the burden switches to the insurer to establish "that the conduct at issue is subject to a policy exclusion." *Patrons Oxford Ins. Co. v. Harris*, 2006 ME 72, ¶ 19, 905 A.2d 819, 826 n.6 (citing *Mut. Fire Ins. Co. v. Hancock*, 634 A.2d 1312, 1313 (Me. 1993)).   The majority rule places the burden of proving an exception to a policy exclusion on the insured.  *Trans World Airlines, Inc. v. Associated Aviation Underwriters*, 58 S.W.3d 609, 621 (Mo. App. 2001).  Such a rule is consistent with the Maine rule that the insured bears the burden of making a prima facie case that coverage exists.  *Id.* (equating the two burdens).  At oral argument, the parties agreed that Ms. Fish had the burden of proving that the exception to the exclusion applied.

**C.      CGL and Automobile Policies: The Dovetail Theory**

Middlesex makes the general point that CGL and automobile insurance policies are designed to mesh.  *Middlesex Resp.* at 7-9.  As a rule, a CGL policy excludes risks associated with owning and operating a motor vehicle and an automobile policy excludes risks other than those associated with owning and operating a motor vehicle.  *Specialty Nat'l Ins. Co. v. OneBeacon Ins. Co.*, 486 F.3d 727, 732 (1st Cir. 2007) (noting that "OneBeacon's auto policy covers liability

14

'*resulting from* the . . . use of a covered auto," while Specialty's [CGL policy] excludes liability '*arising out of* the . . . use. . . of any . . . auto" and that the parties in that case agreed that "their policies are essentially mirror images of each other in this regard—if McMillan's liability is covered under OneBeacon's policy, it is excluded from Specialty's policy and vice versa") (alterations in original); *Stevens v. Fireman's Fund Ins. Co.*, 375 F.3d 464, 467 (6th Cir. 2004) (discussing the view that automobile and general liability policies are usually deemed to be complementary rather than overlapping") (internal citations omitted); *Standard Mut. Ins. Co. v. Bailey*, 868 F.2d 893, 899 n.7 (7th Cir. 1989) (describing the so-called "'dovetail' theory").  Ms. Fish objects, contending that the state of Maine has not adopted the dovetail theory and instead interprets the policy provisions of each policy in accordance with well-established rules of construction and not with regard to an overarching scheme of insurance.  *Fish's Resp.* at 8-11.  She concludes, however, that the two policies here, Mr. Clark's personal auto policy and Clark's Custom Cabinetry's CGL policy, do in fact dovetail.  *Id.* at 11.

Middlesex's point strikes a ring of practicality: a standard form CGL policy should mesh with a standard form auto policy so that no risk the policies together seek to insure is excluded and no risk is insured twice.  But there are a couple of issues that make this point less salient.  Under the dovetail theory, the CGL policy Middlesex issued to Clark's Custom Cabinetry should mesh with a commercial automobile policy, but the record confirms that Clark's Custom Cabinetry did not take out a commercial auto policy.  Though not inconceivable, it seems less likely

that a commercial insurance policy would be designed to dovetail with a personal insurance policy, such as a homeowners or personal auto policy. Moreover, rather than leaving automobile coverage to the automobile policies, the CGL policy expressly covers some auto risks in narrowly-defined situations, such as the parking exception to the auto exclusion. Thus, rather than make the analysis simple—issuing an auto policy to cover auto risks and a CGL policy to cover non-auto risks—the Middlesex CGL policy adds a layer of complexity, making the application of the dovetail theory less obvious and Middlesex's argument more difficult.[3]

### D.     Who is an Insured

#### 1.     Presidential Duties and Clark's Custom Cabinetry

The answer to the parties' contentions is found in the nature of Mr. Clark's duties as President of Clark's Custom Cabinetry and the language of the definition of "Who is an Insured":

> If you are designated in the Declarations as:
> . . .
> d. An organization other than a partnership, joint venture, or limited liability company, you are an insured. Your "executive officers" and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

*Middlesex policy, part 2b* Attach. 3 at 12.

Ms. Fish earnestly contends that this definition is unambiguous. *See*, *e.g.*, *Fish's Obj.* at 7. Maine courts "interpret unambiguous language . . . according to its plain and commonly accepted meaning." *Jack v. Tracy*, 1999 ME 13, ¶ 8, 722 A.2d

---

[3] The Court realizes that Middlesex did not write the policy language but it wrote the policy so it owns the language.

869, 871 (alterations in original) (quoting *Brackett v. Middlesex Ins. Co.*, 486 A.2d 1188, 1190 (Me. 1985)); *Sch. Union No. 37 v. United Nat'l Ins. Co.*, ___F.3d___, No. 09-2040, 2010 WL 3260113, at *5 (1st Cir. Aug. 19, 2010) (saying that Maine law gives ambiguous contract terms their "plain and commonly accepted meaning"). The Court disagrees that the policy language is unambiguous. The policy elsewhere defines "executive officer" but leaves open the definition of what the duties of the officer might be. In the absence of a policy definition for the phrase "with respect to their duties," the duties actually assigned to Mr. Clark infuse meaning into this phrase and create an inherent ambiguity. *City of S. Portland v. Me. Mun. Ass'n*, 2008 ME 128, ¶ 7, 953 A.2d 1128, 1130 (stating that a provision of an insurance contract "is ambiguous if it is reasonably susceptible of different interpretations") (citation omitted). Once there is an ambiguity in the policy, Maine law requires that it be "strictly against the insurer and liberally in favor of the insured." *Pelkey*, 2002 ME 142, ¶10, 804 A.2d at 387 (citation omitted).

For most corporations, the president has a job description that limits the officer's job duties to traditional executive functions, such as attending board meetings, reviewing strategic plans, and overseeing budgets. For many small, closely-held corporations, however, the title "President" does not limit the work the officer is required to perform—from signing corporate tax returns to making cabinets. If Clark's Custom Cabinetry were like many small corporations without a strict delineation of duties for the executive officer, Mr. Clark would fit within the definition of "an insured."

Here, however, Mr. Clark has sworn under oath:

> I have historically handled the bidding and invoicing of jobs, accounts receivable and payable, including paying any contractors or extra help, the coordination of preparation and filing of tax returns and other corporate documents, and securing any necessary permits, bonds and insurance.  At the time of the accident described in this affidavit, I was not performing any of these activities or any duties as an officer or director of Clark's Custom Cabinetry, Inc.

*Aff. of Robert E. Clark, Jr.* Attach. 1 ¶ 3 (Docket # 12).  The potency of Middlesex's argument on this point dies with this affidavit.  Even if the definition of "an insured" could be read to include Mr. Clark while he was pulling into the place of business at the end of a workday, Mr. Clark himself has narrowly defined his actual duties as President of Clark's Custom Cabinetry and the Court must accept his uncontroverted affidavit.[4]  The ambiguity of the phrase, "duties as your officers," has been resolved by Mr. Clark's affidavit, and for this insured in these circumstances, Mr. Clark as President is not "an insured."

Other courts that have considered this phrase have arrived at similar conclusions: depending on the actual duties of the officer, the executive officer of the named insured might or might not fit within the policy definition.  The interplay between the policy language and the facts in the specific case is best illustrated by comparing three cases: *Auto-Owners Insurance Co. v. Rhodes*, 682 S.E.2d 857, 865 (S.C. Ct. App. 2009), *Holderness v. State Farm Fire and Casualty Co.*, 24 P.3d 1235

---

[4] Middlesex admitted Ms. Fish's statement of material fact 7 that contains the first sentence of Mr. Clark's affidavit and made a qualified response to the second sentence.  *Middlesex's Opposing Statement of Material Facts* ¶¶ 7-8 (Docket # 16) (*POSMF*).  Thus, Middlesex admitted that Mr. Clark was not performing any of his executive activities at the time of the accident but did not respond to the contention that he was not performing any duties as an officer of director of Clark's Custom Cabinetry.  In the absence of a response, the Court takes Mr. Clark's assertion that he was not performing any duties as an officer or director of Clark's Custom Cabinetry at the time of the accident as having been admitted by Middlesex.  D. Me. Local Rule 56(f).

(Alaska. 2001), and *Creel*.  In *Auto-Owners*, the South Carolina Court of Appeals rejected the argument that an identical definition of who is an insured did not provide coverage because "none of the activities for which he was sued in the Tort action fall within his duties as an officer of the corporation."  682 S.E.2d at 865.  The *Auto-Owners* Court noted that to conclude the definition did not include the corporate officer, it would "have to find, for what appears to be the first time in South Carolina, that the duties of an officer and those of an employee, as delineated by a general commercial liability policy, are mutually exclusive." *Id.*

In *Holderness*, the Alaska Supreme Court addressed the same policy language:

> [A]bsent a narrower definition of "duties of office," when a policy extends coverage to executive officers acting "with respect to their duties as . . . officers," the coverage should be construed to include all work-related activities performed by executive officers—whether menial or managerial—unless case-specific evidence establishes that an officer actually undertook to perform a narrower range of duties in that capacity.

24 P.3d at 1243 (alterations in original).  The *Holderness* Court noted that there was no record evidence to suggest that Dr. Holderness' "role as an executive officer of Alaska Podiatry Associates was actually limited to managerial or purely "'executive' functions." *Id.*

The *Holderness* Court distinguished *Creel*, a case relied upon heavily by Ms. Fish.  In *Creel*, the executive officer specifically described his responsibilities as president to be limited to "attending and participating in corporate meetings, the hiring and firing of personnel, handling financial dealings, and making corporate

decisions." *Holderness*, 24 P.2d at 1243 (quoting *Creel*, 723 So. 2d at 443). As the executive officer in *Creel* was on his way to spray a house for pests when the accident occurred, the Louisiana court concluded he was not insured. *Creel*, 723 So. 2d at 443.

This Court has no quarrel with the *Auto-Owners* and *Holderness* analysis. In fact, most small corporations operate just the way the small businesses in the two cases operated. Based on Mr. Clark's affidavit, however, Clark's Custom Cabinetry does not. This Court's construction of the duties of Clark's Custom Cabinetry's President follows *Auto-Owners*, *Holderness*, and *Creel*: because Mr. Clark said he was not acting as an officer at the time of the accident, he was not an insured when it occurred. *Compare First Specialty Ins. Corp. v. Am. Home Assur. Co.*, 558 F.3d 97 (1st Cir. 2009) (assuming without discussion that under Maine law an executive performing non-executive functions was insured as an employee pursuant to a CGL policy).

### 2. Policy Considerations

Middlesex makes a number of excellent policy arguments for why its policy should not be interpreted to eliminate an executive officer from coverage when he does the traditional work of a rank and file employee. From the Court's perspective, there is much force to Middlesex's vigorous contention that Ms. Fish's interpretation of its policy language when applied to a closely-held corporation is highly impractical and to interpret this provision to insure Mr. Clark only when he acts as a traditional corporate executive squeezes all common sense out of the intent of the

policy. In effect, the Middlesex policy would provide liability coverage for everyone at Clark's Custom Cabinetry except the one person who needed the insurance the most: the business's mainstay Robert E. Clark, Jr.

The Court acknowledges that the Middlesex policy purports to provide "Commercial General Liability Coverage" for Clark's Custom Cabinetry, but under Ms. Fish's argument, the CGL policy for Mr. Clark's activities is largely illusory, covering Clark's Custom Cabinetry only for a minute percentage of the risks the business undertakes. Ms. Fish's argument for practical purposes takes general liability coverage away from Mr. Clark, insuring only his most momentary and risk-free activity. As Ms. Fish would have it, Mr. Clark, a cabinet-maker, would be covered under his business' CGL policy while he signed the corporate tax returns but not while he made and installed cabinets.

Further, under Ms. Fish's view, the coverage Middlesex provided Clark's Custom Cabinetry would be inconsistent. Although Mr. Clark would not be covered, an employee or a volunteer performing the same work duties would be. Clark's Custom Cabinetry would have purchased a CGL policy that for the vast bulk of work covered everyone working around Mr. Clark but not him.[5]

In addition, coverage would depend not on the nature of the risk but on the form of the business. Had Mr. Clark elected to run his cabinetry business as an

---

[5] The record does not establish how many employees Clark's Custom Cabinetry has. From the submissions, the Court infers that it is a small operation employing few, if any employees other than Mr. Clark. If Clark's Custom Cabinetry had employees other than Mr. Clark, Ms. Fish's argument would work the odd result that Mr. Clark would not be covered for the same risk that the Company's other employee working beside him would be covered for. If Clark's Custom Cabinetry employs only Mr. Clark, then the business's one employee is not covered for the vast bulk of his daily work.

d/b/a, his activities that day would have been covered. *Middlesex policy, part 2b* Attach. 3 at 12 ("If you are designated in the Declarations as . . . [a]n individual, you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner"). If he had run his business as a joint venture or partnership, he would have been covered. *Id.* ("If you are designated in the Declarations as . . . [a] partnership or joint venture, you are an insured. Your members, your partners, and their spouses are also insureds, but only with respect to the conduct of your business"). Yet, the risk of an event triggering the need for coverage did not change because Mr. Clark incorporated. The Court cannot explain why the existence of coverage for Mr. Clark's business should turn on the coincidence of the form of its organization.

It is also true that the unusual circumstances of this case mask the full implications of Ms. Fish's interpretation. The Court infers that, like most insurance customers, Clark's Custom Cabinetry obtained CGL insurance coverage for two reasons: to protect itself and to protect others. Of course, whether Clark's Custom Cabinetry was insured would not affect its legal responsibility for Mr. Clark's actions as an employee. Nevertheless, under Ms. Fish's interpretation, for most business risks, at least those occasioned by Mr. Clark's own actions, Clark's Custom Cabinetry would have no liability coverage. As a consequence, Clark's Custom Cabinetry's business assets would be exposed to whatever its CGL policy did not cover and those harmed by Mr. Clark's actions would be without recourse to its CGL policy proceeds.

Here, the lack of insurance for Mr. Clark as an insured perversely secures insurance coverage for Ms. Fish. But the facts in this case and the way they interact with the policy language are singular. Applying Ms. Fish's interpretation, most injured people seeking to collect against Clark's Custom Cabinetry for injuries or damages caused by its President Mr. Clark, would find Clark's Custom Cabinetry without liability coverage. Oddly, in Ms. Fish's case it is the obverse: if Middlesex's CGL policy covers Mr. Clark's actions on January 19, 2006, Ms. Fish would find herself without Clark's Custom Cabinetry coverage.

Also, under Maine law, courts must construe insurance contracts "in accordance with the intention of the parties, which is to be ascertained from an examination of the whole instrument." *Am. Prot. Ins. Co. v. Acadia Ins. Co.*, 2003 ME 6, ¶ 11, 814 A.2d 989, 993 (citation omitted). If Clark's Custom Cabinetry was seeking coverage, it would have a compelling argument that in purchasing comprehensive general liability coverage, it intended to broadly insure all its workers, including specifically Mr. Clark. Yet, in this case, to the extent it has been heard, the insured Clark's Custom Cabinetry—through the affidavit of its President—seeks to negate coverage. This uncommon turn of events places Middlesex is in the unusual position of contesting coverage by agreeing that the policy definition of "an insured" includes the tortfeasor.

### 3. Conclusion: "Who is an Insured"

All of this makes for a curious fact pattern. Middlesex's policy arguments aside, the Court can only rule on the policy language and facts before it.

Middlesex's points could well carry the day in another case, especially if the executive officer's actual duties correspond to a more typical pattern in closely-held corporations; even though forcefully presented, Middlesex's policy arguments are less convincing because they are premised on an infrequent fact pattern.

In short, Mr. Clark is not "an insured" because he was not performing executive officer duties on January 16, 2006 at the time of the accident and the reason he was not performing executive duties is because he says he was not and there is no evidence to the contrary. Because Mr. Clark was not "an insured" while operating his vehicle on January 16, 2006, the Middlesex CGL policy does not exclude coverage. *Middlesex policy, part 2b* Attach. 3 at 7 (excluding coverage for "[b]odily injury" . . . arising out of the . . . use . . . of any . . . "auto" . . . owned or operated by or rented to or loaded to any insured"). But this conclusion does not end the analysis, it only requires the Court to interpret the policy language with this conclusion in mind.

### E. The Auto Exclusion: "Loaned to an insured"

#### 1. The Policy Language

Even if Mr. Clark was not an insured, Clark's Custom Cabinetry is still an insured and the company is vicariously liable for the damages caused by Mr. Clark, its employee. The Middlesex policy provides coverage unless the auto exclusion applies. *Middlesex policy, part 2b* Attach. 3 at 4 (providing general coverage for "those sums that the insured becomes legally obligated to pay"). The auto exclusion eliminates coverage if Mr. Clark's truck caused the damage to Ms. Fish while

"owned or operated by or rented or loaned to any insured." *Id.* at 7. Because Clark's Custom Cabinetry did not own or rent Mr. Clark's vehicle, the auto exclusion only applies if the company "operated" or "loaned" the truck. The Court concludes that Mr. Clark had "loaned" his personal vehicle to Clark's Custom Cabinetry at the time of the accident and therefore coverage is excluded under the auto exclusion.[6]

### 2. "Loaned" to Clark's Custom Cabinetry

The term "loaned" is not defined in the Middlesex policy. To determine the definition of an undefined word, the Maine Law Court looks to its "plain meaning." *Mortgage Elec. Registration Sys., Inc. v. Saunders*, 2010 ME 79, ¶ 11, ___A.2d___ (giving an undefined contract term the definition used in previous case law and the dictionary). The ordinary meaning of "loaned" is "something lent usually for the borrower's temporary use." Merriam-Webster's Collegiate Dictionary 729 (11th ed. 2003).[7] A car is "used" when it is employed "for some purpose of the user." *Lyons*, 400 A.2d at 352 (stating how "use" is broader than "operation," which means physical "manipulation of the car's controls") (citation omitted). Putting the two definitions together, a vehicle is loaned when the auto is employed for the purpose of the borrower.

---

[6] The other possible exclusion is "operated by . . . any insured." *Middlesex policy, part 2b* Attach. 3 at 7. Because the Court concludes that Mr. Clark was loaning his vehicle to the corporation and concludes that coverage is thereby excluded, it does not separately reach whether Clark's Custom Cabinetry was operating the vehicle. In her Recommended Decision, the Magistrate Judge concluded that as an employee Mr. Clark was operating the motor vehicle for Clark's Custom Cabinetry and the Court affirms her Recommended Decision. *Rec. Dec.* at 11.

[7] The full definition is "**1a:** money lent at interest **b:** something lent usu. for the borrower's temporary use **2a:** the grant of temporary use **b:** the temporary duty of a person transferred to another job for a limited time." Merriam-Webster's Collegiate Dictionary 729 (11th ed. 2003).

A second clue is the contrast between "rented" and "loaned." The provision excludes coverage if the vehicle that caused the damage was, in part, "rented or loaned to any insured." *Middlesex policy, part 2b* Attach. 3 at 7. "Loaned" must have an independent meaning from "rented" or it would be mere "suplusage." *Linnehan Leasing v. State Tax Assesso*r, 2006 ME 33, ¶ 21, 898 A.2d 408, 413 (applying "our rule of construction that we will not treat any provision of a statute as surplusage when a reasonable construction of a statute can provide meaning to each provision") (citation omitted). Under Maine law, "[a] rental of personal property is a contract whereby one gives temporary possession and control of the subject property to another for a consideration." *Lewiston Daily Sun v. Hanover Ins. Co.*, 407 A.2d 288, 293 (Me. 1979). To give meaning to both terms, "loaned" must have a broader definition that includes gratuitous and non-contractual arrangements. *Ropar v. Travelers Ins. Co.*, 422 S.E.2d 34, 37 (Ga. Ct. App. 1992) (distinguishing between the hire of a vehicle for compensation and the "mere gratuitous loan" of a vehicle) (quoting *Am. Employers Ins. Co. v. Yeomans*, 356 So. 2d 1281, 1286 (Fla. Dist. Ct. App. 1978)). Thus, "loaned" must mean something less than a formal or informal lease of the vehicle and something more than its mere use.

Although the Maine Law Court has not addressed the definition of "loaned" in the context of the use of a motor vehicle, other courts embrace a broad definition when interpreting similar CGL contracts. In *EZ Rolloffs, LLC v. The Hermitage Ins. Co.*, the district court held that the auto exclusion clause from a similar CGL

insurance policy precluded coverage because the vehicle had been loaned to the insured company. No. 03-CV-5564 JMR/FLN, 2005 WL 984347, at *4-5 (D. Minn. April 27, 2005). The company sought coverage from its insurance company, arguing that the auto exclusion clause did not apply because neither the owner of the vehicle nor its operator was "insured" under the policy. *Id.* at *4. Rejecting this argument, the district court found that the use of the vehicle for the benefit of the insured company constituted a loan. *Id.* The district court concluded that it is inconsistent to impute the negligent operation of the vehicle to the company, "while simultaneously finding [the driver] is not an agent who took physical possession of the vehicle on the company's behalf." *Id.*; *see also Barge v. Jaber*, 831 F. Supp. 593 (S.D. Ohio 1993) *aff'd*, 39 F.3d 1181 (6th Cir. 1994) (finding that the auto exception clause applied because the employees of the insured company loaned and operated the vehicle for the benefit of the insured); *Bosch v. First Fin. Ins. Co.*, No. C 04 3837 (SBA), 2006 WL 1600581, at *16-17 (N.D. Ca. Jun. 7, 2006) (holding that an employee's personal vehicle was loaned to an employer by virtue of the fact the employee was operating the vehicle for the benefit of the employer); *Andresen v. Employers Mut. Cas. Co.*, 461 N.W.2d 181, 184-85 (Iowa 1990) (same).

In support, Ms. Fish relies heavily on an Alabama Supreme Court case that states that "[t]he use of his automobile by the employee . . . in furtherance of his employer's interest, even with actual or implied permission, does not of itself show a loan to the employer." *Generali US Branch v. The Boyd  Sch., Inc.*, 887 So. 2d 212, 216-17 (Ala. 2004). But the facts in *Generali* are dissimilar. In *Generali*, an

employee of a group home received a call from one of its residents at a restaurant saying that he needed his social security card, which was in his wallet at the group home. *Id.* at 213-14. The employee decided to bring the resident's wallet to him at the restaurant and while backing his personal automobile out of the group home's driveway, he struck and injured a young girl. *Id.* at 214. The *Generali* Court concluded that standing alone, mere use of a personal vehicle for the benefit of an employer does not constitute a loan of the vehicle to the employer. *Id.* at 217. The facts in *Generali* reflect that the employee's use was spontaneous and not regular, distinctions other courts have found significant in differentiating between simple use and a loan. *Compare United States Fire Ins. Co. v. Milood Ben Ali*, 198 F. Supp. 2d 1313, 1320 (S.D. Fla. 2002) (finding that the vehicle was not "hired" by the employer and observing that the employee's use was "occasional and non-compulsory"), *with Stonewall Ins. Co. v. Heter*, 438 So. 2d 950, 952 (Fla. Dist. Ct. App. 1983) (finding a loan when the employer required the employee "to supply a car for daily company use as a condition of employment").

Ms. Fish cites a number of other cases that hold that the fact an automobile is being used on company business, standing alone, is not sufficient to show that the owner loaned the vehicle to the company. *Fish Obj.* at 13 (citing, for example, *Trinity Universal Ins. Co. v. Cincinnati Ins. Co.*, 513 F.2d 915, 920 (6th Cir. 1975)). The Court concurs with this contention as a broad proposition. The difference is in the details. Here, Clark's Custom Cabinetry secured a commercial auto policy for a company vehicle in 2001 but let it expire. *POSMF* ¶¶ 9-10; *Fish's Resp. to*

*Statement of Additional Material Facts* ¶¶ 9-10 (Docket # 25) (*DRSAMF*). Mr. Clark then purchased a vehicle, which he placed in his name and which he insured under a personal auto policy. *Id.* The truck Mr. Clark owned and was operating at the time of the accident was a 2000 GMC extended cab truck and he was hauling a Hallmark closed trailer, which he personally owned as well. *POSMF* ¶¶ 2-3; *DRSAMF* ¶¶ 2- 3, 9.[8]

In these circumstances, the conclusion that Mr. Clark was using his personal vehicle for his business is inescapable. The vehicle with the attached trailer was particularly suited for his work as a cabinet maker, he was hauling his tools to the business location at the end of the workday, and he obviously gave himself permission to use the truck for business purposes. The record suggests that Mr. Clark had been using this truck for this business purpose for about four years.[9] Finally, this is not the spontaneous and momentary use of a personal vehicle as in

---

[8] The parties presented a limited record and the Court considered denying the motion and the cross-motion to allow the parties to more fully develop the facts. For example, the record does not reveal whether Clark's Custom Cabinetry itself owned a vehicle during this period, where the Clark vehicle was typically garaged, who had keys to the vehicle, the extent of personal as opposed to business use, and the Clarks' ownership of other personal vehicles. The Court has inferred that Mr. Clark had been using his truck for work since he bought it in 2002 but there is no express statement that he did so. As the parties here are represented by highly experienced counsel, the Court assumes they put forward the current record for a reason. Accordingly, the Court ruled within the constraints of the record they developed.

[9] The record does not definitively state that Mr. Clark had been using his personal vehicle for four years for work. However, the Court has inferred that he must have done so. The vehicle is designed as a work truck suitable for a cabinet maker and in her response to Middlesex's additional statement of material fact 10, Ms. Fish states that "[i]t is equally likely that Clark simply let the [earlier commercial auto policy] expire because he bought a new truck in his own name which he insured with a different carrier." *DRSAMF* ¶ 10.

Nor is this a situation—as in many closed corporations—where the corporate form was ignored; Mr. Clark, as we have seen, has made a clear distinction between his role as president and his other duties as an employee.

*Generali.* In short, with these facts, it is difficult to characterize Mr. Clark's use of the truck that day as anything but a loan of his personal truck to his business.

### F.     The "Parking" Exception to the Automobile Exclusion

As an insured under the Middlesex CGL policy, Mr. Clark's actions could be covered if he fit within the parking exception to the automobile exclusion. The parking exception reads:

> This exclusion does not apply to:
>
> Parking an "auto" on, or on the ways next to, premises you own or rent, provided the "auto" is not owned by or rented or loaned to you or the insured.

*Middlesex policy, part 2b* Attach. 3 at 7. Because the Court has determined that Mr. Clark loaned his personal vehicle to Clark's Custom Cabinetry, the parking exception to the auto exclusion does not apply. The Court does not reach the other questions about the applicability of the exception—was the accident "on, or on the ways next to" and did Clark's Custom Cabinetry "rent" the premises.[10]

### G.     Summary

The Court concludes that Mr. Clark was not an insured under Clark's Custom Cabinetry's CGL policy and that Mr. Clark had loaned his personal vehicle to his corporation for corporate business when the accident took place; therefore, the auto exclusion applies and the parking exception to the auto exclusion does not. Middlesex does not provide coverage for the damages and injuries Ms. Fish sustained as a result of the automobile accident of January 19, 2006.

---

[10] The record on these issues is especially sparse and coverage may depend on the resolution of disputed factual issues.

## III. CONCLUSION

The Court AFFIRMS the Magistrate Judge's Recommended Decision (Docket # 33). The Court GRANTS Middlesex's Motion for Summary Judgment (Docket # 17) and ORDERS that judgment be entered in favor of Middlesex. The Court DENIES Ms. Fish's Motion for Summary Judgment (Docket # 13).

SO ORDERED.


/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
CHIEF UNITED STATES DISTRICT JUDGE

Dated this 24th day of August, 2010